# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 01-1261

IN RE:
CORALYNN F. NELSON,

*Debtor-Appellant*,

v.

LA CROSSE COUNTY DISTRICT ATTORNEY (STATE OF
WISCONSIN) and TIM GRUENKE,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 00 C 690—**John C. Shabaz**, *Judge.*

ARGUED SEPTEMBER 14, 2001—DECIDED AUGUST 23, 2002

Before FLAUM, *Chief Judge*, and MANION and WILLIAMS,
*Circuit Judges.*

MANION, *Circuit Judge.* Ronald and Coralynn Nelson filed
for personal bankruptcy. Although Mrs. Nelson received a
discharge, the government filed a separate criminal charge
against her for crimes connected with her operation of an
incorporated business. Her appeal involves the scope of a
State's sovereign immunity in the bankruptcy context. In
this case, she filed an adversary complaint against the State
of Wisconsin. The State moved to dismiss, arguing that the

Eleventh Amendment barred the suit. The bankruptcy court disagreed, holding that the Eleventh Amendment does not apply to bankruptcy cases. On appeal, the federal district court reversed, concluding that the State had sovereign immunity from suit under the Eleventh Amendment and that it had not waived that immunity. The district court then remanded the case back to the bankruptcy court for dismissal of the adversary proceeding. The debtor appeals, and we affirm.

## I. BACKGROUND

On April 8, 1999, Ronald and Coralyn Nelson filed for protection under Chapter 7 of the United States Bankruptcy Code. *In re Nelson*, No. 99-21588-7 (Bankr. W.D. Wis.). Mrs. Nelson set forth various obligations in her bankruptcy petition, some of which she incurred in her individual capacity and others on behalf of Discovery Child Care Center, Inc., a non-profit daycare facility located in La Crosse, Wisconsin, of which she was the executive director. That same day, Discovery filed its own Chapter 7 bankruptcy petition. *See In re Discovery Child Care Center, Inc.*, No. 99-21587-7 (Bankr. W.D. Wis.). The State of Wisconsin, through its Department of Instruction, filed a claim in Discovery's separate bankruptcy proceeding, seeking damages from Discovery for breach of contract. The State did not file a claim in Mrs. Nelson's individual bankruptcy case. On July 27, 1999, Mrs. Nelson received a discharge in her individual bankruptcy case. The record does not reveal the current status of Discovery's separate bankruptcy proceeding.

On December 14, 1999, the La Crosse County District Attorney's Office commenced a three-count criminal action in state court, charging Mrs. Nelson with theft by bailee, theft by fraud and embezzlement, arising out of activities

that she was alleged to have committed as Discovery's director. The next day, Mrs. Nelson commenced an adversary proceeding in her individual bankruptcy case against the District Attorney's Office and Tim Gruenke, the Assistant District Attorney primarily responsible for the prosecution of her criminal case. Specifically, Mrs. Nelson's adversary proceeding alleged that the District Attorney's Office and Gruenke violated 11 U.S.C. § 524, which enjoins creditors from taking steps to collect a discharged bankruptcy debt from a debtor by initiating a criminal action against her for the sole purpose of obtaining a restitution order. In her prayer for relief, Mrs. Nelson requested a permanent injunction against both the District Attorney's Office and Gruenke under 11 U.S.C. § 105 to preclude them from proceeding with the criminal indictment against her,[1] as well as actual and punitive damages from both defendants in an unspecified amount.

The State defendants filed a motion to dismiss the adversary complaint for lack of subject matter jurisdiction under the Eleventh Amendment and for failure to state a claim upon which relief could be granted. Alternatively, the defendants requested the bankruptcy court to abstain in favor of the pending state court criminal case pursuant to 28 U.S.C. § 1334 and the *Younger* abstention doctrine.[2] At a

---

[1]  Section 105(a) provides that a court "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of the [Bankruptcy Code]." 11 U.S.C. § 105(a).

[2]  Section 1334(c)(1) of Title 28 of the United State Code provides that "[n]othing in this section [granting original and exclusive jurisdiction in bankruptcy cases to federal courts] prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular pro-
(continued...)

status conference, the defendants asked the bankruptcy court to decide the jurisdictional issue first, and the bankruptcy court agreed to do so. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998) (holding that the "requirement that jurisdiction be established as a threshold matter springs from the nature and limits of the judicial power of the United States and is inflexible and without exception") (citations omitted). In its jurisdictional analysis, the bankruptcy court first noted that Section 106(a) of the Bankruptcy Code contains a specific abrogation of state sovereign immunity as a defense available to States as to certain matters arising thereunder, including Section 524. The bankruptcy court then acknowledged that, following the Supreme Court's decision in *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996), a number of courts have held that Congress lacked authority under Article I of the Constitution to enact Section 106(a). *See Nelson v. La Crosse County District Attorney (State of Wisconsin) (In re Nelson)*, 254 B.R. 436, 440 (Bankr. W.D. Wis. 2000). However, the bankruptcy court posited that the "real issue is whether the state actually has any immunity to waive." *Id.* at 442. The court concluded that it did not need to address the implication of *Seminole Tribe* because all of the States had generally waived their sovereign immunity in the bankruptcy context by ratifying the Constitution under the "plan of the Convention" doctrine. *Id.* at 443. Accordingly, the bankruptcy court denied the defendants' motion to dis-

---

[2]  (...continued)
ceeding arising under title 11 or arising in or related to a case under title 11." *Id.* Under the *Younger* abstention doctrine, federal courts cannot enjoin ongoing state criminal proceedings unless extraordinary circumstances are present. *See Younger v. Harris*, 401 U.S. 37, 43-44 (1971); *State of Indiana v. Haws*, 131 F.3d 1205, 1210 (7th Cir. 1997).

miss based on lack of jurisdiction, concluding that the Eleventh Amendment was not applicable in bankruptcy cases. *Id.* at 447.

The defendants then filed an interlocutory appeal to the federal district court. *See Cherry v. Univ. of Wisconsin Sys. Bd. of Regents*, 265 F.3d 541, 546 (7th Cir. 2001) (denial of Eleventh Amendment immunity is immediately appealable). The district court reversed the decision of the bankruptcy court, holding that the Eleventh Amendment bars suits by private citizens against a State in bankruptcy court. *See In re Nelson*, 258 B.R. 374 (W.D. Wis. 2001). The district court also determined that the State had not waived its immunity by filing a claim in Discovery's bankruptcy case. *Id.* at 376. The district court further concluded that under the *Younger* abstention doctrine, the bankruptcy court could not enjoin a state criminal proceeding, noting that if the State eventually issued a restitution order in the criminal action, the bankruptcy court could then properly address whether such restitution qualified as a dischargeable debt.[3] *Id.* Accordingly, the district court reversed the decision of the bankruptcy court and remanded the matter for dismissal of the adversary proceeding. Coralynn Nelson appeals this decision.

## II. ANALYSIS

On appeal, Mrs. Nelson argues that the district court erred in concluding that the Eleventh Amendment bars her adversary proceeding against the State defendants for two reasons: (1) Congress validly abrogated the States' sovereign

---

[3] Criminal restitution orders are generally non-dischargeable in bankruptcy. *See* 11 U.S.C. § 523(a)(7); *Kelly v. Robinson*, 479 U.S. 36, 53 (1986) (holding that criminal restitution orders fall within the meaning of § 523(a)(7)).

immunity in bankruptcy cases by enacting Section 106(a) of the Bankruptcy Code; and (2) the States, by ratifying the Constitution, waived their sovereign immunity in the bankruptcy context. The State argues in response that under *Seminole Tribe* and its progeny, Congress lacked the authority to abrogate State sovereign immunity in Section 106(a) and that those cases implicitly negate Mrs. Nelson's "plan of the Convention" argument as well. We review the grant or denial of a state's sovereign immunity defense *de novo. See Richman v. Sheahan*, 270 F.3d 430, 434 (7th Cir. 2001). In reviewing this issue, we begin with Section 106(a), discussing whether it is a valid abrogation of State sovereign immunity under Article I of the Constitution. We then address Mrs. Nelson's "plan of the Convention" argument, and conclude by evaluating whether there are any other alleged limits on a State's sovereign immunity applicable in this case.

### A.  Abrogation of Sovereign Immunity under Section 106(a)

To understand the concept of sovereign immunity, it is important to put into historical context the framework and structure of our nation's federal Constitution. As the Supreme Court recently recognized, "[d]ual sovereignty is a defining feature of our Nation's constitutional blueprint. States, upon ratification of the Constitution, did not consent to become mere appendages of the Federal Government. Rather, they entered the Union with their sovereignty intact." *Federal Maritime Comm'n v. South Carolina State Ports Auth.*, ___ U.S. ___, 122 S.Ct. 1864, 1870 (2002) (citations omitted). Thus, although "the Constitution establishes a National Government with broad, often plenary authority over matters within its recognized competence, the founding document 'specifically recognizes the States as sovereign entities.'" *Alden v. Maine*, 527 U.S. 706, 713 (1999) (citing

*Seminole Tribe*, 517 U.S. at 71 n. 15). At the very core of sovereign immunity is the inherent right of the sovereign to be immune from private suit. *See Alden*, 527 U.S. at 715 ("The generation that designed and adopted our federal system considered immunity from private suits central to sovereign dignity.").

Notwithstanding the universal understanding of both the meaning and scope of sovereign immunity at the time of our nation's founding, the Supreme Court held, in *Chisolm v. Georgia*, 2 U.S. (2 Dall.) 419 (1793), that under the plain meaning of Article III a private citizen of another State could sue the State of Georgia in federal court without its consent.[4] Only Justice Iredell dissented in *Chisolm*, arguing that the language of Article III was insufficient to authorize a suit against a State without its consent. The "Court's decision fell upon the country with a profound shock," *Alden*, 527 U.S. at 720 (citations omitted), because "the state conventions which addressed the issue of sovereign immunity in their formal ratification documents . . . made clear that they . . . understood the Constitution as drafted to preserve the States' immunity from private suits." *Id.* at 718. In response to, and within a short time of the *Chisolm* decision, the Eleventh Amendment was proposed, approved by both houses of Congress and ratified by the States, the purpose of which was "not to change but to restore the original constitutional *design*." *Alden*, at 722 (emphasis added). Thus, as the Supreme Court has consistently emphasized, "sovereign immunity derives not from the Eleventh Amendment but from the

---

[4]  Article III provides, in relevant part, that the "Judicial Power [of the United States] shall extend to all Cases, in Law and Equity, . . . to Controversies between a State and Citizens of another State . . . ." U.S. Const. Art. III, § 2.

structure of the original Constitution itself." *Id.* at 728. *See also Federal Maritime Comm'n*, 122 S.Ct. at 1871; *Seminole Tribe*, 517 U.S. at 54.

The Eleventh Amendment to the Constitution provides that "[t]he Judicial Power[5] of the United States shall not be construed to extend to any suit[6] in law or equity, commenced or prosecuted against one of the United States[7] by

---

[5] The Eleventh Amendment is phrased in terms of the "Judical Power" of the United States. However, courts have not limited its application to Article III courts. *See e.g.*, *Federal Maritime Comm'n*, 122 S.Ct. at 1875 (holding that Congress may not use "Article I powers to create court-like administrative tribunals where sovereign immunity does not apply"); *Alden*, 527 U.S. at 754 (holding that Congress may not abrogate state sovereign immunity from suits in *state* court); *In re Sacred Heart Hosp. of Norristown*, 133 F.3d 237, 243 n. 9 (3d Cir. 1998) (noting that Eleventh Amendment is not limited to Article III courts). *See also* 28 U.S.C. § 151 ("In each judicial district, the bankruptcy judges in regular active service shall constitute a unit of the district court to be known as the bankruptcy court for that district."). In any case, Mrs. Nelson does not contend that the Eleventh Amendment is not implicated on this basis.

[6] The term "suit" as used in the Eleventh Amendment applies to adversarial proceedings such as the one before us. *See*, *e.g.*, *In re Mitchell*, 209 F.3d 1111, 1116-17 (9th Cir. 2000) (holding that adversary proceeding to determine dischargeability of taxes owed to the states constitutes a "suit" under Eleventh Amendment); *Texas v. Walker*, 142 F.3d 813, 823 (5th Cir. 1998) (noting same). In any event, except as discussed in Section II (C) below, Mrs. Nelson does not contend that her adversary proceeding is not a "suit" for purposes of the Eleventh Amendment.

[7] By its terms, the Eleventh Amendment protects "States." Mrs. Nelson brought her suit against the "La Crosse County District Attorney's Office (State of Wisconsin)." The Eleventh Amendment extends to state agencies and departments and, subject to the *Ex Parte Young* doctrine, to state employees acting in their official capacities.

(continued...)

Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. In describing the scope of the Eleventh Amendment, the Supreme Court has stressed that:

> [a]lthough the text of the Amendment would appear to restrict only the Article III diversity jurisdiction of the federal courts, we have understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition which it confirms. That presupposition . . . has two parts: first, that each State is a sovereign entity in our federal system; and second, that it is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent.

---

[7]  (...continued)

*See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 123-24 (1984) (holding that relief against county and state officers was barred by the Eleventh Amendment because the state funded and cooperated in operating the county program at issue). However, the Eleventh Amendment generally does not "extend to suits prosecuted against a municipal corporation or other governmental entity which is not an arm of the State," *Alden*, 527 U.S. at 756, although county sheriffs may act as an arm of the state when performing certain functions and thus fall within the ambit of the Eleventh Amendment. *See Richman*, 270 F.3d at 439-40 (holding that Illinois county sheriff was not acting as an arm of the state when performing courtroom security duties). *Cf. McMillian v. Monroe County, Alabama*, 520 U.S. 781 (1997) (holding that a county sheriff was a state official for purposes of Section 1983). Here, the State asserts that in Wisconsin district attorneys are state employees, *citing* Wis. Stat. ch. 978, and as such are entitled to whatever protection the Eleventh Amendment offers. Mrs. Nelson does not dispute this assertion, and we need not address the matter further. *See Florida Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank*, 527 U.S. 627, 633 n.3 (1999).

*Seminole Tribe*, 517 U.S. at 54 (internal citations omitted). Thus, "the Court has upheld States' assertions of sovereign immunity in various contexts outside the literal text of the Eleventh Amendment." *Alden*, 527 U.S. at 727. The Eleventh Amendment has also been construed to bar suits against a State by its own citizens, as well as by citizens of another state. *See Hans v. Louisiana*, 134 U.S. 1, 15 (1890). It is not limited to diversity cases, but also applies to prevent suits invoking federal question jurisdiction. *See Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 268 (1997) (relying on *Seminole Tribe*). Additionally, the Eleventh Amendment has been interpreted to protect non-consenting States from suit in *state* as well as federal court. *See Alden*, 527 U.S. at 754. And, most recently, in *Federal Maritime Commission*, the Supreme Court extended the protection of the Eleventh Amendment beyond traditional judicial fora to administrative claims against non-consenting States filed with executive branch agencies, reasoning that federal agencies share "strong similarities" with federal courts. 122 S.Ct. at 1874. The Court noted that the Framers of the Constitution, "who envisioned a limited Federal Government, could not have anticipated the vast growth of the administrative state." *Id.* at 1872. The Court also emphasized that "[t]he preeminent purpose of state sovereign immunity is to accord States the dignity that is consistent with their status as sovereign entities." *Id.* at 1874.

Nevertheless, the Supreme Court has recognized that under certain circumstances Congress may validly abrogate a State's Eleventh Amendment immunity. Mrs. Nelson argues that, to the extent that the Eleventh Amendment applies in this case, it has been abrogated by 11 U.S.C. § 106(a), which provides that "[n]otwithstanding an assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit to the extent set forth in this section . . . ." *Id.* To validly do so, Congress must (1) unequivocally express an intent to abrogate state immunity,

and (2) must act pursuant to a valid exercise of legislative power. *Seminole Tribe*, 517 U.S. at 55. Congress' intent to abrogate a State's immunity "must be obvious from 'a clear legislative statement.'" *Id.* (citing *Blatchford v. Native Village of Noatak*, 501 U.S. 775, 786 (1991)). There is no dispute that the text of Section 106(a) clearly and unequivocally expresses a clear legislative intent to abrogate state sovereign immunity.[8] *See, e.g.*, *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 73 (2000) (holding that ADEA contained clear statement of Congress' intent to abrogate States' sovereign immunity); *Florida Prepaid*, 527 U.S. at 635 (Court found that Patent Remedy Act contained clear intent to abrogate States' sovereign immunity). And, indeed, the parties do not suggest otherwise. Thus, the only remaining issue is whether Congress enacted Section 106(a) pursuant to a valid exercise of legislative power.

Mrs. Nelson contends that Section 106(a) is a valid exercise of legislative power under Article I, Section 8, Clause 4 of the Constitution, the Bankruptcy Clause, which empowers Congress to "establish . . . uniform Laws on the subject of Bankruptcies throughout the United States." While the Supreme Court has not directly addressed the question of whether the Bankruptcy Clause of Article I authorizes Con-

---

[8] In *Hoffman v. Connecticut Dep't of Income Maint.*, 492 U.S. 96 (1989), the Supreme Court held that the predecessor of current Section 106(c) did not validly abrogate an unconsenting State's Eleventh Amendment immunity with respect to money judgments because Congress had failed to make its intention to do so unmistakably clear. *Id.* at 104. Consequently, in the Bankruptcy Reform Act of 1994, Congress significantly revised Section 106 to expressly provide for the abrogation of sovereign immunity. However, in *Hoffman*, the Supreme Court declined to address whether Congress could validly abrogate sovereign immunity under its bankruptcy power in the first place, as it would later do in other contexts in *Seminole Tribe* and its progeny. *Id.*

gress to abrogate state sovereign immunity, its recent federalism decisions are clearly dispositive of the issue.

As the parties rightly acknowledge, the seminal case guiding our analysis is *Seminole Tribe of Fla. v. Florida.* There, the Seminole Indian Tribe sued the State of Florida under the Indian Gaming Regulatory Act, which specifically provided for suits against states in federal court.[9] 517 U.S. at 51. The State of Florida moved to dismiss, arguing that Congress lacked authority to pass a law abrogating its Eleventh Amendment immunity. *Id.* at 52. The Court determined that the Gaming Act had been enacted pursuant to Congress' legislative authority under the Indian Commerce Clause, U.S. Const. art. I, § 8, cl. 3, and then held that

> [e]ven when the Constitution vests in Congress complete lawmaking authority over a particular area, the Eleventh Amendment prevents congressional authorization of suits by private parties against unconsenting States. The Eleventh Amendment restricts the judicial power under Article III, and Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction.

517 U.S. at 72-73.

In reaching its conclusion, the Supreme Court noted that it had previously found authority to abrogate the Eleventh Amendment under only two provisions of the Constitution: the Interstate Commerce Clause, *see Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 19-20 (1989), and Section 5 of the Fourteenth Amendment, *see Fitzpatrick v. Bitzer*, 427 U.S. 445, 453-

---

[9] The statute provided, in relevant part, that federal district courts have jurisdiction "over any cause of action . . . arising from the failure of a State to enter into negotiations . . . or to conduct such negotiations in good faith." 25 U.S.C. § 2710(d)(7).

56 (1976). *See Seminole Tribe*, 517 U.S. at 59. With respect to the first source of authority, the Court reasoned that since the Interstate Commerce Clause and the Indian Commerce Clause were both Article I powers there was no "principled distinction in favor of the States to be drawn between the [two]," *id.* at 63, and as such concluded that *Union Gas* "has proved to be a solitary departure from established law, . . . was wrongly decided and that it should be, and now is, overruled." *Id.* at 66. The Court then turned to Section 5 of the Fourteenth Amendment,[10] explaining that it had "fundamentally altered the balance of state and federal power struck by the Constitution." *Id.* at 59.[11] In other words, by ratifying the Fourteenth Amendment, the States agreed to relinquish a portion of the sovereign immunity they previously enjoyed under the Constitution and the Eleventh Amendment. Therefore, "when acting pursuant to § 5 of the Fourteenth Amendment, Congress can abrogate the Eleventh Amendment without the States' consent." *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 238 (1985). This is because the States already provided that consent through their approval of the Amendment itself. After *Seminole Tribe*, Section 5 of the Fourteenth Amendment remains the *only* valid source of legislative authority by which the Supreme Court has held that Congress may validly abrogate a State's Eleventh Amendment immunity. *See Kimel*, 528 at 80; *Alden*, 527 at 756; *Florida Prepaid*,

---

[10] Section 5 of the Fourteenth Amendment expressly grants Congress the power "to enforce, by appropriate legislation, the provisions of this article." U.S. Const. amend. XIV, § 5.

[11] Thus, the impact of the Section 5 of the Fourteenth Amendment is distinct from that of the Eleventh Amendment, which merely restored the original constitutional equilibrium between the two sovereigns at the formation of the Union, undermined and disregarded by the *Chisolm* decision. *See Alden*, 527 U.S. at 722.

527 U.S. at 637. Mrs. Nelson, however, does not contend that Section 106 was enacted pursuant to the Fourteenth Amendment, and therefore we do not address whether it is a valid abrogation of State sovereign immunity thereunder.

While *Seminole Tribe* did not directly address whether the Bankruptcy Clause of the Constitution was subject to the Eleventh Amendment, Justice Stevens raised the issue in his dissent, expressing a concern that the decision would prohibit federal jurisdiction over suits to enforce, *inter alia*, the bankruptcy laws against the States. *See Seminole Tribe*, 517 U.S. at 77 & n.1 (Stevens, J., dissenting). Justice Rehnquist, writing for the majority, directly responded to this concern by stating that, with respect to Congress' bankruptcy power in particular, "it has not been widely thought that the federal antitrust, bankruptcy, or copyright statutes abrogated the States' sovereign immunity. This Court never has awarded relief against a State under any of those statutory schemes. . . ." 517 U.S. at 72, n.16.

Mrs. Nelson takes issue with Justice Rehnquist's statement, claiming that prior to *Seminole Tribe*, the Supreme Court had not hesitated to find that States fell within the scope of bankruptcy court jurisdiction. In support of her argument she relies on *New York v. Irving Trust Co.*, 288 U.S. 329 (1933), where the State of New York brought an untimely claim for unpaid franchise taxes, and the trustee struck its claim. The State claimed that the trustee's ability to do so violated its sovereign immunity. In upholding the trustee's act, the Court noted that, "[i]f a state desires to participate in the assets of a bankrupt, she must submit to appropriate requirements by the controlling power; otherwise, orderly and expeditious proceedings would be impossible and a fundamental purpose of the Bankruptcy Act would be frustrated." *Id.* at 333. Mrs. Nelson also relies upon the holding of *Gardner v. New Jersey*, 329 U.S. 565

(1947), where New Jersey filed a proof of claim for unpaid taxes in the debtor's bankruptcy proceeding, and in response to objections to the claim, raised an Eleventh Amendment defense. In upholding the authority of the bankruptcy court to hear the action, the Court declared that settled law established "that the bankruptcy court was constitutionally empowered to order a sale of property" free and clear of state tax liens. *Id.* at 578. Both of these cases are easily distinguished from the case at bar because they involved situations where the State itself *voluntarily* entered into the bankruptcy proceeding and thus *consented* to the court's jurisdiction. As such, *Irving Trust* and *Gardner* more aptly demonstrate that a State may waive its sovereign immunity (which waiver, of course, presumes States enjoy such immunity in the first instance). The notion that a State may voluntarily waive its immunity is not a new doctrine, nor is it one that has been called into question by *Seminole Tribe* or its progeny. *See College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 681 n. 3 (1999) (stating that *Gardner*, "which held that a bankruptcy court can entertain a trustee's objections to a claim filed by a State, stands for the unremarkable proposition that a State waives its sovereign immunity by voluntarily invoking the jurisdiction of the federal courts."). Thus, contrary to Mrs. Nelson's position, these cases do not stand for the proposition that a State lacks sovereign immunity in bankruptcy suits. To the extent that any of the Supreme Court's pre-*Seminole Tribe* cases remotely suggest otherwise, their "precedential value" has been eviscerated by that decision and the other federalism cases that have followed in its wake.

Indeed, since its decision in *Seminole Tribe*, the Supreme Court has affirmed its holding with respect to Congress' lack of authority to abrogate State sovereign immunity under Article I in *any* context and in increasingly stronger terms. *See, e.g., Board of Trustees of Univ. of Alabama v. Garrett,*

531 U.S. 356, 364 (2001) ("Congress may not, of course, base its abrogation of the States' Eleventh Amendment immunity upon the powers enumerated in Article I."); *Kimel*, 528 U.S, at 79 ("Under our firmly established precedent then, if the ADEA rests solely on Congress' Article I commerce power, the private petitioners in today's cases cannot maintain their suits against their state employers."); *Alden*, 527 U.S. at 748 ("it is settled doctrine that neither substantive federal law nor attempted congressional abrogation under Article I bars a State from raising a constitutional defense of sovereign immunity in federal court"); *Florida Prepaid*, 527 U.S. at 636 ("*Seminole Tribe* makes clear that Congress may not abrogate state sovereign immunity pursuant to its Article I powers; hence the Patent Remedy Act cannot be sustained under either the Commerce Clause or the Patent Clause."). *See also MCI Telecomm. Corp. v. Illinois Bell Tel. Co.*, 222 F.3d 323, 338 (7th Cir. 2000) ("as the Supreme Court has made inescapably clear, Congress may not abrogate Eleventh Amendment immunity through the exercise of its Article I power.").

The unequivocal language of these cases demonstrates that the Supreme Court's holding in *Seminole Tribe* was not limited to Article I's Indian Commerce Clause, but applies equally to Congress' attempt to abrogate sovereign immunity under any other Article I legislative power. Moreover, while the Supreme Court has yet to specifically consider Congress' attempt at abrogating the States' sovereign immunity in the bankruptcy context,[12] every court to address

---

[12] In *In the Matter of Merchant's Grain, Inc.*, 59 F.3d 630 (7th Cir. 1995), a case from this circuit pre-dating *Seminole Tribe*, we held that Congress did have the power to abrogate state sovereign immunity, and in doing so specifically relied on the Supreme Court's decision

(continued...)

the issue since *Seminole Tribe* concluded that it may not do so under its Article I powers. These courts correctly held that the Supreme Court's holding in *Seminole Tribe* is not limited to the Indian Commerce Clause, but rather extends to all of Congress' Article I powers, including the Bankruptcy Clause, and thus properly concluded that Section 106(a) was unconstitutional under the Eleventh Amendment. *See, e.g., In re Mitchell*, 209 F.3d at 1118-19; *In re Sacred Heart Hosp.*, 133 F.3d at 243; *In the Matter of Estate of Fernandez*, 123 F.3d 241, 243-44 (5th Cir. 1997); *In re Creative Goldsmiths of Washington, D.C.*, 119 F.3d 1140, 1145 (4th Cir. 1997).[13]

---

[12] (...continued)

in *Union Gas*, 491 U.S. at 19-20 (holding that Congress could abrogate the Eleventh Amendment pursuant to the Interstate Commerce Clause of Article I). 59 F.3d at 635. However, after the Supreme Court expressly overruled *Union Gas* in *Seminole Tribe, see* 517 U.S. at 66, it granted the State's petition for a writ of certiorari and vacated our decision in *Merchant's Grain*, remanding it for further consideration in light of *Seminole Tribe. See Ohio Agricultural Commodity Depositors Fund v. Mahern*, 517 U.S. 1130 (1996). On remand, the case was rendered moot before reconsideration, and we have not had occasion to revisit the issue until now. Nor has the Supreme Court.

[13] Of course, some courts, such as the bankruptcy court in this case, have held that Eleventh Amendment immunity does not apply in the bankruptcy context for other reasons. Some of these courts have adopted the argument that States waived sovereign immunity in bankruptcy by ratifying the Constitution. *See, e.g., In re Hood*, 262 B.R. 412 (6th Cir. BAP 2001); *In re Nelson*, 254 B.R. 436 (Bankr. W.D. Wis. 2000); *In re Bliemeister*, 251 B.R. 383 (Bankr. D. Ariz. 2000), aff'd 296 F.3d 858 (9th Cir. July 19, 2002) (on alternative grounds that State waived it sovereign immunity by its conduct in the proceeding). Others have concluded that Section 106(a) is a valid abrogation of State sovereign immunity under Section 5 of the Fourteenth Amendment. *See, e.g., In re Lees*, 252 B.R. 441, 448 (Bankr. W.D. Tenn. 2000) (Section 106 is valid abrogation of State sovereign immunity under

(continued...)

Based on the Supreme Court's decision in *Seminole Tribe* and its progeny, as well as the decisions of our sister circuits, we conclude that Congress did not validly abrogate State sovereign immunity when enacting Section 106(a) pursuant to its Article I legislative power. Given the foregoing analysis, we find no reason to distinguish Congress' power under the Indian Commerce Clause, that it purported to exercise in *Seminole Tribe*, from its power under the Bankruptcy Clause for purposes of State sovereign immunity, *see Hoffman*, 492 U.S. at 105 (Scalia, J., concurring in judgment) (noting that "there is no basis for treating [Congress'] powers under the Bankruptcy Clause any differently" from its powers under the Commerce Clause), especially in light of the Supreme Court's subsequent holdings which have consistently emphasized Congress' limited ability to abrogate State sovereign immunity.

### 1. Plan of the Convention.

As she did successfully before the bankruptcy court, Mrs. Nelson attempts to distinguish her case from *Seminole Tribe* and its progeny. First, she argues that Congress' enactment of Section 106(a) was unnecessary because the States had already surrendered their sovereign immunity in the bank-

---

[13] (...continued)
the Fourteenth Amendment), aff'd 264 B.R. 884 (W.D. Tenn. 2001) (on alternative grounds that Tennessee Student Assistance Corporation was not an "arm of the state" entitled to Eleventh Amendment protection). However, no court, to our knowledge, has concluded that Congress possesses authority under Article I to abrogate State sovereign immunity in the bankruptcy context, notwithstanding *Seminole Tribe* and its progeny.

ruptcy context through the "plan of the Convention."[14] She contends that the Framers understood the Constitution itself, through Article I's Bankruptcy Clause, to subject States to federal legislative authority *and* to eliminate State sovereign immunity from suits to enforce those federal bankruptcy laws. Thus, according to her argument, by ratifying the Constitution the States agreed to surrender their sovereign immunity in this respect. She further argues that the Eleventh Amendment did not restore the pre-convention sovereign immunity, citing the Supreme Court's statement in *Alden* that the Eleventh Amendment did not create any new immunity, but merely corrected the error made by the Court in *Chisolm. See Alden*, 527 U.S. at 728 (noting that sovereign immunity neither derives from nor is limited by the Eleventh Amendment but stems instead from the Constitution itself). The bankruptcy court agreed with Mrs. Nelson and concluded that the States had indeed surrendered their immunity as to bankruptcy law by ratifying the Constitution. In doing so, the bankruptcy judge candidly acknowledged that his conclusion was the minority position, and that very few courts had reached the same conclusion after *Seminole Tribe*.[15]

---

[14] This phrase is found in Alexander Hamilton's *The Federalist No. 81*, where he stated "It is inherent in the nature of sovereignty, not to be amenable to the suit of an individual without its consent. This is the general sense and the general practice of mankind, and the exemption, as one of the attributes of sovereignty, is now enjoyed by the government of every state in the Union. Unless therefore, there is a surrender of this immunity in the *Plan of convention*, it will remain with the states, and the Danger intimated must be merely ideal." (emphasis added).

[15] For a further discussion of the "plan of the Convention" theory, see the cases cited *infra* at note 13.

The Supreme Court has stated that in "exercising its Article I powers Congress may subject the States to private suits in their own courts only if there is 'compelling evidence' that the States were required to surrender this power to Congress pursuant to the constitutional design." *Alden*, 527 U.S. at 730-31 (citing *Blatchford*, 501 U.S. at 781). However, in noting this particular limit on Eleventh Amendment immunity, the Court identified only two examples where the States had done so: "suits brought by other States or by the Federal Government." 527 U.S. at 755. *See also Blatchford*, 501 U.S. at 781-82 (rejecting plan of convention argument; States by entering into the Constitution did not consent to suit by Indian tribes). Since *Seminole Tribe*, the Supreme Court has not referred to any part of the constitutional design or structure that would permit a private party to bring suit against a State under a law enacted by Congress pursuant to any of its Article I legislative powers. Nor has Mrs. Nelson presented us with "compelling evidence" that the States' were required to surrender such immunity in the bankruptcy context.

We reject the bankruptcy court's and Mrs. Nelson's "plan of convention" argument because it is clearly untenable under *Seminole Tribe* and its progeny. In *Seminole Tribe*, the Court noted that "[u]nder the rationale of *Union Gas*, if the States' partial cession of authority over a particular area [there, interstate commerce] includes cession of the immunity from suit, then their virtually total cession of authority over a different area [i.e., the Indian Commerce Clause] must also include cession of the immunity from suit." *Seminole Tribe*, 517 U.S. at 62. In rejecting this rationale, and thus overruling *Union Gas*, the Court held, that "[e]ven when the Constitution vests in Congress complete lawmaking authority over a particular area, the Eleventh Amendment prevents congressional authorization of suits by private parties against unconsenting States." *Id.* at 72. These

cases make clear that the States, by ceding certain enumerated legislative powers, did not relinquish their immunity from suit in those areas. And, as we have previously noted, there is nothing in these decisions indicating that bankruptcy should be treated differently than any other Article I power. While the ratification of the Bankruptcy Clause of Article I by the States illustrates that they clearly surrendered their power to enact bankruptcy laws, there is nothing in the text of that clause or in the structure of the Constitution indicating that the States consented to being sued in bankruptcy court. In other words, "the Eleventh Amendment . . . does not free [a State] from federal law, but simply the jurisdiction of federal courts." *In re NVR, LP*, 189 F.3d 442, 452 (4th Cir. 1999).[16]

### 2. Uniformity requirement.

Next, Mrs. Nelson argues that the Bankruptcy Clause should be treated differently from other Article I powers because it contains a uniformity requirement.[17] This is not a meaningful distinction. *See Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 172 (1946) (Frankfurter, J., concurring) ("The Constitutional requirement of uniformity is a requirement of geographic uniformity."). Likewise, other circuits presented with this argument have flatly rejected it. *See, e.g., In re Sacred Heart Hosp.*, 133 F.3d at 243

---

[16] Additionally, if the "plan of the Convention" argument was tenable, one is left to wonder why Congress attempted to abrogate the States' sovereign immunity by enacting Section 106.

[17] As noted, Article I, Section 8, Clause 4 of the Constitution, the Bankruptcy Clause, empowers Congress to "establish . . . *uniform* Laws on the subject of Bankruptcies throughout the United States." (emphasis added).

(stating that because "Eleventh Amendment immunity applies uniformly to all states and to all parties in a bankruptcy proceeding, the uniformity requirement is not frustrated); *Estate of Fernandez,* 123 F.3d at 244 (same). Moreover, the Supreme Court recently rejected a similar argument with respect to the necessity of uniformity in the regulation of maritime commerce. In *Federal Maritime Commission,* the Court held that, under *Seminole Tribe,* "[a]lthough the Federal Government undoubtedly possesses an important interest in regulating maritime commerce . . . 'the background principle of state sovereign immunity embodied in the Eleventh Amendment is not so ephemeral as to dissipate when the subject of the suit is in an area . . . that is under the exclusive control of the Federal Government.'" 122 S.Ct. at 1878 (quoting *Seminole Tribe,* 517 U.S. at 72).

Accordingly, we conclude that the Bankruptcy Clause of Article I is not a valid source of authority for Congress to abrogate a State's sovereign immunity and that the States did not surrender their immunity from suit in bankruptcy under the "plan of the Convention." Thus, the defendants are immune under the Eleventh Amendment from Mrs. Nelson's adversary proceeding.


### B.  Limits on Eleventh Amendment

Having concluded that the defendants are protected by the Eleventh Amendment, and enjoy sovereign immunity from Mrs. Nelson's adversary proceeding in bankruptcy, we need now consider whether the State defendants waived their Eleventh Amendment immunity in this case. *Seminole Tribe,* 517 U.S. at 72 n. 16 (noting that, notwithstanding Eleventh Amendment immunity, "several avenues remain open for ensuring state compliance with federal law").

### 1. Waiver or consent.

A State may waive its sovereign immunity, notwithstanding the fact that the Eleventh Amendment is cast in terms of jurisdictional bar. *See Coeur d'Alene*, 521 U.S. at 267. For example, when a state files a claim in a bankruptcy case there is a limited waiver of sovereign immunity. *See Gardner*, 329 U.S. at 574. In *Gardner*, the Supreme Court held that a state's sovereign immunity did not bar a debtor from asserting defensive objections to a proof of claim filed by the State in a bankruptcy proceeding because the State had waived its immunity. *Id.* In *College Savings Bank*, the Court reaffirmed this principle, stating that *Gardner*, "which held that a bankruptcy court can entertain a trustee's objections to a claim filed by a State, stands for the unremarkable proposition that a State waives its sovereign immunity by voluntarily invoking the jurisdiction of the federal courts." 527 U.S. at 681 n. 3.[18]

Here, however, the State did not file a proof of claim in Mrs. Nelson's bankruptcy proceeding. The State—through its Department of Instruction, not the District Attorney's Office—only filed a claim in Discovery's bankruptcy proceeding.[19] Mrs. Nelson argues, however, that the State waived its immunity by filing that claim. Both the bankruptcy court and the district court determined that the State had not waived its sovereign immunity in Mrs. Nelson's case by filing a claim in Discovery's corporate bankruptcy proceeding because she was not personally responsible for Discovery's debts. Mrs. Nelson seeks to blur the lines be-

---

[18] Of course, we once again stress that the ability of a State to waive its sovereign immunity in the bankruptcy context presupposes that there is such immunity from suit in the first place.

[19] Mrs. Nelson was Discovery's executive director.

tween these separate and distinct bankruptcies by arguing that a State's waiver in one bankruptcy proceeding is effective as to all interrelated proceedings. However, the two cases cited by Mrs. Nelson in support of her argument involved situations where the State had filed a proof of claim in the actual bankruptcy case at issue. *See In re Rose*, 187 F.3d 926, 930 (8th Cir. 1999) (holding that "[d]isputes arising out of the adjudication of a single debt may be sufficiently intertwined so that a waiver in one aspect applies to others as well"; where State had filed proof of claim in debtor's bankruptcy proceeding, but raised Eleventh Amendment defense in debtor's adversary proceeding against State seeking discharge of student loan debt)*; In re Straight*, 143 F.3d 1387, 1391 (10th Cir. 1998) (proof of claim filed by one state agency in bankruptcy proceeding served as waiver for entire state in that proceeding). Thus, neither case addressed whether a State may waive its immunity in one bankruptcy case by filing a proof of claim in a separate one.

We reject Mrs. Nelson's argument that the State constructively waived its sovereign immunity by filing a claim in a corporate bankruptcy case factually linked to her bankruptcy case.[20] Waiver of sovereign immunity must be unequivocal. *See Atascadero*, 473 U.S. at 239-40. Even if the State's filing in the *Discovery Child Care* bankruptcy could be labeled a constructive waiver, that would not suffice.

---

[20] The bankruptcy court's discussion of Mrs. Nelson's waiver argument is particularly cogent: "[t]he plaintiff in this case and Discovery Child Care Center, Inc. remain separate legal entities notwithstanding her argument that various personal guarantees render them essentially indistinguishable. The Court questions whether she would be so quick to surrender the shield from liability offered by the corporate form were she to have been sued by a corporate creditor to whom she owed no personal liability." *In re Nelson*, 254 B.R. at 442.

*See College Sav. Bank*, 527 U.S. at 675-78 (overturning the constructive or implied waiver principle set out in *Parden v. Terminal Ry. of the Alabama State Docks Dep't*, 377 U.S. 184 (1964)). Additionally, the Supreme Court's "test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one," *College Sav. Bank*, 527 U.S. at 675 (citation omitted), and is designed to safeguard the sovereign dignity of the States. Applying this stringent test to Nelson's "interrelated bankruptcy waiver" argument, we conclude that the State did not unequivocally waive its immunity in *her* bankruptcy proceeding by filing a claim in Discovery's bankruptcy proceeding. *Contrast In re Platter*, 140 F.3d 676, 680 (7th Cir. 1998) (concluding that State's claim of Eleventh Amendment immunity did not bar action in bankruptcy court to determine discharge of debt because state had initiated adversarial action against debtor).

### 2.   *Ex Parte Young* exception to Eleventh Amendment immunity.

There is another exception to a State's Eleventh Amendment immunity—the *Ex Parte Young* doctrine, explained by the Supreme Court in *Alden*: "The constitutional privilege of a State to assert its sovereign immunity . . . does not confer upon the State a concomitant right to disregard the Constitution or valid federal law." 527 U.S. at 754-55. The *Ex Parte Young* doctrine thus provides that suits against state officials, seeking prospective equitable relief for ongoing violations of federal law, are not barred by the Eleventh Amendment. *Id.* at 757. *See also Ex Parte Young*, 209 U.S. 123 (1908).

The bankruptcy court held that even if the Eleventh Amendment were applicable to bankruptcy proceedings, Mrs. Nelson's claim for prospective injunctive relief against

the District Attorney himself would survive a motion to dismiss under the *Ex Parte Young* doctrine. *In re Nelson*, 254 B.R. at 447-48. While the State appealed the bankruptcy court's decision to the district court, and in so doing specifically appealed the bankruptcy court's reliance on the *Ex Parte Young* doctrine, the district court did not discuss the doctrine and simply held that the bankruptcy court's decision was reversed and remanded for dismissal of the entire adversary proceeding. On appeal, in arguing for reversal, Mrs. Nelson did not assert in her opening brief any argument based on the *Ex Parte Young* doctrine. In its response brief, the State noted that she had failed to address the issue.[21] Mrs. Nelson then raised it in her reply brief, but did not develop the argument. It is well settled that issues raised for the first time in a reply brief are deemed waived. *See James v. Sheahan*, 137 F.3d 1003, 1008 (7th Cir. 1998) ("Arguments raised for the first time in a reply brief are waived."). Mrs. Nelson bore the burden of setting forth a reason to reverse the district court. Because she did not do so, we express no opinion on the applicability of the *Ex Parte Young* doctrine to the case before us.

## C. In Rem Jurisdiction

Finally, we reach Mrs. Nelson's last argument, that sovereign immunity does not apply to protect the State of Wis-

---

[21] The State briefly contended that the *Ex Parte Young* doctrine does not apply to the case at bar, relying on two exceptions outlined by the Supreme Court. First, as in *Seminole Tribe*, the States argued that the doctrine does not apply where Congress has already prescribed a detailed and comprehensive remedial scheme, here the Bankruptcy Code. See *Seminole Tribe*, 517 U.S. at 74. Second, the State argued that the "special state sovereign interest" exception outlined in *Coeur d'Alene* applied, specifically referring to its interest in enforcing its criminal laws. 521 U.S. at 281-88.

consin from injunctive relief because bankruptcy courts merely exercise *in rem* jurisdiction over the debtor's estate.[22] She claims that bankruptcy courts are empowered to resolve the status of bankruptcy assets without invading the rights of the State, and thus without running afoul of the Eleventh Amendment. As applied to this case, she contends that the adversary proceeding is, in substance, merely an attempt to clarify the scope of her discharge order and, as such, only concerns a *res,* i.e., her estate. In support of her argument, Mrs. Nelson relies upon the Supreme Court's decision in *California v. Deep Sea Research,* 523 U.S. 491 (1998), where the Court held that the Eleventh Amendment did not apply to bar federal court jurisdiction over an admiralty action where the State claimed an interest in, but did not actually possess, the *res* in dispute (there, an abandoned ship). Mrs. Nelson claims that *Deep Sea* is analogous to her adversary proceeding because, here, the State (by seeking criminal restitution) is attempting to obtain assets from her as a debtor which are not in its possession.

Mrs. Nelson's argument, however, completely overlooks the fact that she filed an *adversary proceeding,* and that such a proceeding is not an *in rem* action merely involving the property of the bankruptcy estate, but an *in personam* action against the State of Wisconsin itself and its employees (acting in their official capacities) that seeks to enjoin them from prosecuting her. The State did not, however, file a claim in her bankruptcy proceeding, seeking access to her bankruptcy estate, but instead filed criminal charges against her based on alleged criminal activity.

Because of Article I's grant of exclusive power to the federal government to legislate in the bankruptcy context, and

---

[22] Mrs. Nelson does not argue that this exception applies to her claim for damages, and therefore we do not address that possibility.

by virtue of the Supremacy Clause, a State may very well have its rights affected by a bankruptcy proceeding. As the Fourth Circuit has aptly explained:

> It is true that if a state wishes to challenge a bankruptcy court order of which it receives notice, it will have to submit to federal jurisdiction. . . . The state, of course, may well choose not to appear in federal court. But that choice carries with it the consequence of foregoing any challenge to the federal court's actions. While forcing a state to make such a choice may not be ideal from the state's perspective, it does not amount to the exercise of federal judicial power to hale a state into federal court against its will and in violation of the Eleventh Amendment. Instead it is the result of Congress' constitutionally authorized legislative power to make federal courts the exclusive venue for administering the bankruptcy law.

*Maryland v. Antonelli Creditors' Liquidating Trust*, 123 F.3d 777, 787 (4th Cir. 1997). *See also In re Platter*, 140 F.3d at 680 (acknowledging that a State may have its rights affected by a bankruptcy proceeding). However, as we have explained, unless a State consents to suit, a bankruptcy court may not exercise jurisdiction over the State without running afoul of the Eleventh Amendment. Two decisions from the Fourth Circuit serve to illustrate the distinction. First, in *In re Creative Goldsmiths*, *supra*, the court determined that an *adversary proceeding* against the State of Maryland to avoid a preferential transfer (of income tax payments) violated the Eleventh Amendment. 119 F.3d at 1147. Applying *Seminole Tribe*, the court concluded that Congress had no authority to abrogate state sovereign immunity by enacting Section 106(a). *Id.* at 1145-47. Therefore, without Maryland's consent, the bankruptcy court lacked jurisdiction to hear the trustee's action against the State to avoid the transfer. We

contrast this decision to the Fourth Circuit's decision in *In re Collins*, 173 F.3d 924 (4th Cir. 1999). There, the debtors petitioned the bankruptcy court to reopen their estate to determine the dischargeability of a judgment debt owed to the Commonwealth of Virginia.[23] The bankruptcy court held that the debt was discharged, and the district court affirmed this decision. On appeal, for the first time, the Commonwealth asserted its sovereign immunity under the Eleventh Amendment. In considering this defense, the Fourth Circuit concluded that the Eleventh Amendment did not preclude the bankruptcy court from reopening the case to determine the dischargeability of the debt, even though it was owed to the Commonwealth. The court noted that bankruptcy courts exercise jurisdiction over debtors and the bankruptcy estate when discharging a debt, rather than *in personam* jurisdiction over the estate's creditors. Thus, where Virginia was not named as a defendant, served with process or compelled to appear, *id.* at 929, "[n]othing compels the state to submit to the jurisdiction of the federal bankruptcy court, and the court's power to allow or deny a state's claim derives from the court's jurisdiction over the bankruptcy estate. In short, if a state wishes to share in the estate, it must submit to federal jurisdiction." *Id.* at 930. Essentially, the *Collins* court concluded that the motion to reopen the bankruptcy proceeding did not constitute a "suit against one of the United States" for Eleventh Amendment purposes.[24] *Id.* at 929. As the court in *Collins* explained, the case was distinguishable from *In re Creative Goldsmiths*, "where the state was summonsed to appear upon being sued by the trustee in an adversary proceeding in bankruptcy court." *Id.* at 928.

---

[23] The debtor was a bail bondsman, and the Commonwealth sought to collect on pre-bankruptcy judgments entered against him for forfeited bail bonds.

[24] *See supra* note 6.

The same distinction is applicable in this case. Unlike the State of California in *Deep Sea* and the Commonwealth of Virginia in *Collins,* Mrs. Nelson's adversary proceeding was brought against the defendants to prevent them from prosecuting her, and they are necessary, named, parties in the action. Accordingly, we conclude that the *in rem* "exception" to Eleventh Amendment immunity is not applicable in the present case.[25]

### III.

For the foregoing reasons, we conclude that Congress lacked authority under Article I of the Constitution to abrogate state sovereign immunity by enacting Section 106(a) of the Bankruptcy Code. As such, the State is entitled to Eleventh Amendment immunity from Mrs. Nelson's bankruptcy adversary proceeding. Furthermore, we reject Mrs. Nelson's argument that the States waived their sovereign immunity in the bankruptcy context by ratifying the Constitution under the "plan of the Convention." We also conclude that the State did not waive its sovereign immunity from suit in Mrs. Nelson's personal bankruptcy case by filing a proof of claim in a separate bankruptcy proceeding for the corporation that employed her. Finally, we reject Mrs. Nelson's argument that the bankruptcy court may exercise *in rem* jurisdiction over her adversary proceeding against these de-

---

[25] Because we conclude that the State is protected under the Eleventh Amendment, we need not reach its alternative arguments that it is also protected under the Anti-Injunction Act, 28 U.S.C. § 2284, and the doctrine developed under *Younger v. Harris,* 401 U.S. 37 (1971). *See generally* Craig Peyton Gaumer, Curbing an Expropriation of Power: The Argument Against Allowing Bankruptcy Courts to Enjoin State Criminal Proceedings, 16-MAR Am. Bankr. Inst. J. 12 (1997).

fendants. Because Mrs. Nelson waived her legal arguments with respect to the *Ex Parte Young* doctrine, we express no opinion on its applicability to the case before us. Accordingly, we AFFIRM the judgment of the district court to dismiss the adversary proceeding.

A true Copy:

      Teste:

 

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*